Kenneth S. Kawabata, Esq., State Bar No. 149391
(ksk@manningllp.com)
Matthew Soleimanpour, Esq., State Bar No. 248434
(ams@manningllp.com)
**MANNING & KASS ELLROD RAMIREZ TRESTER LLP**
550 West "C" Street, Suite 1900
San Diego, California 92101
Telephone: (619) 515-0269
Facsimile: (619) 515-0268

Michael A. Geibelson, Esq., State Bar No. 179970
(mageibelson@rkmc.com)
**ROBINS KAPLAN MILLER & CIRESI LLP**
2049 Century Park East, Suite 3400
Los Angeles, California 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5800

Attorneys for Defendant
IKEA U.S. WEST, INC.

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REID YEOMAN and RITA MEDELLIN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>IKEA U.S. WEST, INC., a Delaware Corporation; and DOES 1 through 50, inclusive,<br><br>    Defendant. | Case No. 3:11-CV-701-WQH-BGS<br><br>**DECLARATION OF KATE WALLACE IN SUPPORT OF DEFENDANT IKEA U.S. WEST, INC.'S MOTION TO DECERTIFY CLASS ACTION**<br><br>**[CONTAINS MATERIAL DESIGNATED AS CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER]**<br><br>Date:        October 15, 2012<br>Time:        11:00 a.m.<br>Courtroom:  4, 4th Floor<br>Judge:       William Q. Hayes |

I, KATE WALLACE, declare as follows:

1.  The following facts are within my own personal knowledge and if called to testify, I would and could competently testify thereto.

2.  I have been employed by IKEA since March 1999 and am its Checkout Services Manager. As the Checkout Services Manager, my job duties include the maintenance and implementation of policies and procedures associated with the cashiered and self-service registers in all of IKEA's U.S. stores. In that capacity, I also work with the Front Line Managers to monitor and ensure the implementation of IKEA's policies and procedures at the store level.

3.  Until February 2011, and at various times over the years, IKEA has included among the procedures at the point of sale registers prompts for the entry of ZIP codes into the POS system. This zip code collection functionality could be and was turned on and off by the stores. When the function was turned off, the prompts for zip codes described below were not a part of the transaction flow at any of the registers.

4.  From 2009 through the present, IKEA has used two cashiering systems to process transactions: cashiered check-out registers and self check-out kiosks. In addition to the fact that the former are manned by human cashiers and the latter are not, the procedures involved in completing transactions and the customer interface at each of them are dramatically different.

**Self Check-Out Kiosks**

5.  IKEA's self check-out kiosks include an optical scanner, a visual display/touch pad interface, and a card scanner. When the customer begins the transaction, the visual display instructs the customer to scan the first item. The optical scanner is used by the customer to scan the UPC bar code on the product to add the product to the transaction. The visual display then

instructs the customer to place the scanned item in the bagging area and alternatively to scan the next item or to complete and pay for the transaction.

6. After all items are scanned and the complete the transaction option is selected, when the zip code functionality was turned on, the screen of the visual display/touch pad would display the "Zip Code Prompt" in the form depicted in Exhibit "A" attached hereto. As appears from Exhibit "A", the screen instructs the customer to "Enter Zip Code or Key 00000." In addition to those options, the screen presented the customer with the option of pressing the "No Thanks" button to the right of the digits 3 and 6 on the digital key pad.

7. This visual prompt was intended to convey to the customer that a ZIP code was not required to be entered in order to complete the transaction, regardless of the form of payment.

8. In fact, these messages were effective in conveying to customers using the self check-out kiosks that a ZIP code was not required to complete the transaction because a significant percentage of customers using the self check-out kiosks entered "00000" or "No Thanks" in response to the prompt. Therefore, at least those customers, and likely many more who chose to enter their ZIP codes, must have understood that ZIP codes were being requested for a purpose that was merely incidental to their use of any particular form of payment, and was instead being requested for another special purpose such as IKEA's marketing efforts.

**Cashiered Registers**

9. The procedures related to the requests for and recording of ZIP codes at cashiered registers are the same regardless of the method of payment ultimately selected.

10. At the cashiered registers, cashiers were prompted by the registers to enter ZIP codes without regard to the method of payment selected by the customer. The prompt to the cashier was as depicted in Exhibit "C" hereto.

11. To comply with these procedures, cashiers were instructed to ask customers for

their ZIP codes when the POS system prompted them to do so, and to enter the customers' ZIP codes into the POS system when they were recited by the customer. Cashiers were also instructed how to cancel out of and avoid the need to enter a ZIP code in order to complete the transaction. This was taught to cashiers so that cashiers could complete transactions even if the customers did not know, could not communicate, or did not want to provide their ZIP codes. Specifically, cashiers were instructed that they could avoid the need to enter a zip code and yet continue and complete the transaction by pushing the "CANCEL" button on the register, or by entering five zeros as the ZIP code. As a result, cashiers were effectively instructed how to avoid the need to request a customer for a ZIP code in order to process transactions.

12. In practice, cashiers frequently have not complied with the procedures related to requesting and recording ZIP codes, and have entered false and nonexistent ZIP codes, as well as ZIP codes and other numbers that are not actually requested from the customer, in order to circumvent those procedures. I have personally observed frequent deviations from these procedures in stores across the country. In addition to my personal observations, I have had discussions with employees, including cashiers and the Front Line Managers who supervise the cashiers about the reasons that cashiers do not follow IKEA's procedures in regard to requesting and recording ZIP codes. Included in these discussions was conversation about the ways that cashiers deviate from those procedures.

13. Based upon my observations and discussions, IKEA's cashiers have done all of the following to deviate from IKEA's procedures and without actually requesting or recording customers' actual ZIP codes in the POS system:

(a) Entering "CLEAR" to cancel the ZIP code prompt function;

(b) Entering five zeroes ("00000") in lieu of a ZIP code;

(c) Entering one or more zeros and then entering "CLEAR;"

- 4 -

DECLARATION OF KATE WALLACE

(d) Entering the cashiers' own personal residence ZIP code;

(e) Entering the store's ZIP code; and

(f) Entering a made-up ZIP code

(g) Entering the same ZIP code on multiple successive occasions.

14. Cashiers deviate from IKEA's procedures related to the requesting and recording of ZIP codes for all of the following reasons:

(a) Requesting and recording ZIP codes was viewed as unnecessary because cash registers are set up in a manner that allows cashiers to complete the transaction without entering a ZIP code, or by entering a false ZIP code.

(b) Requesting and recording ZIP codes was viewed as unnecessary because cashiers' performance was not judged on the accuracy or number of ZIP codes they recorded.

(c) Requesting and recording ZIP codes took too much time, particularly when there was a line of customers waiting to check out and for the reasons set forth below. Cashiers at IKEA are judged on their productivity, that is, the number of transactions they can complete within a given amount of time. Therefore cashiers' advancement, potentially in terms of their position with the company, and their compensation are in part dependent upon their productivity. Cashiers were also managed based upon their productivity. Because the requesting and recording of ZIP codes took time (wasted time, from the perspective of the cashier) but was not a criterion for evaluation, cashiers chose to deviate from IKEA's procedures in the interest of completing more transactions.

(d) Requesting and recording ZIP codes took too much time and was annoying

to cashiers because a significant number of customers do not speak English. As a result, requests for ZIP codes were met with confusion, and attempts at explanation either were unsuccessful or unnecessarily lengthy. For those people who did not speak English at all (and cashiers who could not speak Spanish to those customers who spoke Spanish), language barriers made the request for ZIP codes futile.

(e) Requesting and recording ZIP codes took too much time and was annoying to cashiers because customers would be confused and ask about the reason for the request, or simply inquire about what the ZIP code would be used for. Cashiers were instructed to respond to these customers truthfully, and to explain that the ZIP codes were used only for IKEA's own internal marketing purposes, i.e. determining how many and where to send IKEA's catalogs.

15. The extent to which cashiers circumvented IKEA's procedures with respect to the requesting and recording of ZIP codes was shown by the ZIP Code Collection Reports that I distributed to Front Line Managers across the country, including those in the California stores.

16. The ZIP Code Collection reports I provided included the following information:

    a. Whether a point of sale cashier collected a valid ZIP code;

    b. Whether the point of sale cashier failed to collect a ZIP code;

    c. Whether the cashier entered multiple zeroes (indicating a failure to make a request or a customer's failure to provide the information); and

    d. Whether there were anomalies within the data indicating that a cashier failed to properly request and record a customer's ZIP code described as a "high frequency of data entry." In such occasions, the data is perceived as invalid due to a

particular ZIP code being entered on an excessive number of occasions. Often, the ZIP code data labeled as a high frequency data entry would be the store's ZIP code or the cashier's own ZIP code.

17. Those reports demonstrate that cashiers, particularly those in the California stores, recorded ZIP codes in a low percentage of transactions, and that the percentage of transactions in which valid ZIP codes were entered was even lower. The low percentage of valid ZIP codes illustrates not only that cashiers were not requesting zip codes in those instances when no ZIP code appears in the transaction log, but also that cashiers were falsifying ZIP codes as another means of circumventing IKEA's cashiering procedures.

18. I am informed that an example of the ZIP Code Collection Reports has been produced within IKEA's Responses to Request for Production of Documents, Set One, as IKEA 000634-000754, a true and correct copy of which is attached hereto as Exhibit "D". As indicated in IKEA 000635-36, all of the California stores with the exception of Covina and Emeryville collected valid ZIP codes in less than 50% of their transactions during the period of one of IKEA's Zip Code Collection Reports from February 2006 through May 2006. Covina and Emeryville were only marginally better. These percentages have varied slightly over the years, but the pattern remained the same – valid ZIP codes were collected in approximately only half of the transactions.

19. The low frequency with which ZIP codes have been recorded is also reflective of a similarly low frequency with which ZIP codes have even been requested of customers, regardless of whether they were recorded. That is, based upon my observations and experience, ZIP codes are not requested nearly as infrequently as they are not properly recorded.

20. Despite my distribution and urging of Front Line Managers' use of the ZIP Code Collection Reports in department meetings and performance evaluations to encourage cashiers to

request and record customers' ZIP codes, cashiers have continued to circumvent the ZIP code prompt function for the reasons stated above to increase their productivity in each of the years I have been Front Line Manager.

I declare under penalty of perjury of the laws of the United States and the State of Pennsylvania and California that the foregoing is true and correct.

Executed this       August 16, 2012 in Conshohocken, Pennsylvania.


By: *Kate Wallace*
Kate Wallace, Declarant

# EXHIBIT "D"
# FILED UNDER SEAL