# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REID YEOMAN, *ET AL.*<br><br>   Plaintiffs,<br><br>v.<br><br>IKEA U.S.A. WEST, INC.,<br><br>   Defendant. | Case No. 11-cv-00701-BAS(BGS)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS FOR DEFENDANT PURSUANT TO RULE 52, OR, IN THE ALTERNATIVE, TO DECERTIFY THE CLASS (ECF NO. 261); AND**<br><br>**(2) SETTING HEARING ON DAMAGES PHASE AS TO PLAINTIFF MEDELLIN** |

## I.    INTRODUCTION

On March 2, 2011, Plaintiff Reid Yeoman initiated this action by filing a Complaint in the Superior Court of California for the County of San Diego. The Complaint contained one claim for violations of the Song-Beverly Credit Card Act of 1971. On April 6, 2011, the matter was removed to this Court by Defendant Ikea U.S. West, Inc. ("Ikea"). On November 8, 2011, Plaintiff Yeoman filed a First Amended Class Action Complaint which added Plaintiff Rita Medellin ("Plaintiff").

On January 13, 2012, Plaintiff filed a motion for class certification. The motion was granted on May 4, 2012. Ikea subsequently moved to decertify the class. On February 27, 2013, Ikea's motion to decertify was granted in part. The class definition was modified to read:

> The Class consists of all persons from whom Ikea requested and recorded a ZIP Code in conjunction with a credit card transaction in California from February 16, 2010 through February 28, 2011 (the "Class"). Excluded from the Class are (i) transactions wherein personal information was required for a special purpose incidental but related to the individual credit card transaction, including, but not limited to, information relating to shipping, delivery, servicing, or installation of the purchased merchandise, or for special orders; (ii) transactions wherein a credit card issued to a business was used; and (iii) transactions executed at self-checkout kiosks. Also excluded from the Class are the officers and directors of Defendant and of its corporate parents, subsidiaries and affiliates, or any entity in which Defendant has a controlling interest, and the legal representatives, successors or assigns of any such excluded persons or entities, and the Court to which the matter is assigned.

The parties agreed to a bench trial before this Court. On August 18, 2014, the Court granted Ikea's motion *in limine* to bifurcate the liability phase on Plaintiff's class action claim from the damages phase. The proceedings on the liability phase took place on November 12-13, 2014. The Court heard and weighed the testimony and evidence presented by Plaintiff. Following Plaintiff's presentation of evidence in the liability phase of the trial, Ikea moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, or, in the alternative, to decertify the Class. The Court grants in part and denies in part Ikea's motion, finding as follows:

## II.   FINDINGS OF FACT

### A.   Rita Medellin

1. On August 22, 2010, Plaintiff made two purchases from Ikea in San Diego. She used her personal Visa credit card for both purchases.

2. After Plaintiff presented her credit card for payment, the cashier asked

for her ZIP code.  Plaintiff believed the cashier needed the ZIP code for security purposes because she was using a credit card.  Therefore, she provided her ZIP code.  Plaintiff did not provide her ZIP code for purposes of shipping, delivery, special order, or any other reason other than as a condition for using her credit card.

3. The cashier recorded Plaintiff's ZIP code in Ikea's transaction logs.

4. Other than the recorded ZIP code, Plaintiff remembers little else about her visit to Ikea.

### B. The Class

5. During the period from February 16, 2010 to February 28, 2011 (the "Class Period"), Ikea operated eight stores in California.  At these stores, Ikea accepted credit cards, debit cards, gift cards, cash, and a store-branded credit card for payment.

6. During the Class Period, at the direction of its Marketing Department, Ikea instituted a process to capture customer ZIP codes from customers in California at the time a customer paid for his or her item.  These ZIP codes were recorded in transaction logs that noted the date and amount of the transaction.  The transaction logs did not otherwise identify the purchaser.  Although the method of payment was noted in the transaction logs, the logs did not distinguish between signature debit cards and credit cards.  The logs also did not distinguish between corporate credit cards and consumer credit cards.  The logs did not identify whether the ZIP code was also needed for another purpose such as arranging delivery of the merchandise.

7. The transaction logs also noted ZIP codes of customers who came through the self-check kiosks.  Customers who went through the self-check kiosks were clearly notified that provision of a ZIP code was voluntary and not required to complete a transaction.  There was both a big button and a voice prompt that told customers if they did not want to enter their ZIP codes, they could just press "no thanks."

8. First Data was a company that processed Ikea's credit card purchases.

1  Ikea paid a different fee depending on whether the credit card purchase was a true
2  credit card purchase or was a signature debit card purchase.  Thus, First Data sent
3  Ikea daily statements noting the number of credit card versus debit card purchases.
4  These statements also noted whether the credit card used was a commercial/business
5  credit card or was a consumer credit card.  However, these statements from First
6  Data were only retained for six months, and any statements from the Class Period no
7  longer exist.

8        9. Cashiers at Ikea were told that customers were not required to give their
9  ZIP codes.  Cashiers were instructed how to circumvent entry of a ZIP code (by
10 pushing "00000").  Cashiers who asked were told that Ikea was collecting ZIP codes
11 to decide where to locate another Ikea store.

12       10. Upon analyzing the ZIP codes in the transaction logs, Ikea's Marketing
13 Department concluded the ZIP codes collected were highly unreliable:  there was a
14 preponderance of ZIP codes such as "12345", ZIP codes that matched the store's
15 ZIP code, "90210" (the Beverly Hills TV show ZIP code), and ZIP codes that were
16 nonexistent.  The Marketing Department's analysis of the data showed a lack of
17 consistency among the stores and among the cashiers within the stores in collecting
18 the ZIP codes.

19       11. Kathleen Wallace, Ikea's checkout services manager, testified that she
20 had been informed about the poor quality of the ZIP code collections, but that she
21 had never followed up with any of the cashiers, because there was more pressure to
22 move customers through the lines quickly than there was to collect ZIP codes.

23       12. When cashiers and cashier managers were trained, emphasis was placed
24 on providing the customer a good experience (which included getting them through
25 check-out quickly).  Cashiers were given a goal of two minutes per customer.
26 Entering ZIP codes took away from this goal and was not a high priority, so cashiers
27 tended to ignore the procedure.

28       13. There were other legitimate reasons cashiers asked for ZIP codes:  they

were required to verify the security of a card when they were keying in a credit card number (because the swiping did not work); when home delivery or shipping was arranged; when Ikea was providing a kitchen planning service, measuring service, or installation or business design service; when customers applied for an Ikea credit card or applied for a special warranty; or when a customer was returning a product.

14. Ikea did not store customers' names or credit card information together with the ZIP code information, so there was no way Ikea could identify anyone who had provided a ZIP code.

15. There was no evidence presented as to what any cashier ever said in asking for a ZIP code other than what one cashier said to Plaintiff.

16. There is no way to tell from the transaction logs whether a customer had gone through a self-check kiosk in the past, at which time the customer would have been told clearly that provision of a ZIP code was voluntary.

17. There is no way to tell from the transaction logs which ZIP codes were collected from a consumer credit card versus a signature debit card versus a corporate credit card transaction.

18. There is no way to tell from the transaction logs whether the ZIP code recorded by the cashier was the customer's actual ZIP code.

19. There is no way to tell from the transaction logs whether a customer provided a ZIP code in order to obtain home delivery or shipping or some other service from Ikea.

### III. CONCLUSIONS OF LAW

20. The Song-Beverly Credit Card Act, California Civil Code §1747.08 ("the Act") is a consumer protection statute, making it a violation for a business to "[r]equest, or require, as a condition [of] accepting [a] credit card as payment…the cardholder to provide personal identification information, which the [business] causes to be written, or otherwise records…." Cal. Civ. Code § 1747.08(a)(2).

21. Under *Pineda v. Williams-Sonoma Stores, Inc.*, 51 Cal.4th 524 (2011),

ZIP code information alone, even in the absence of a name, street address, phone number, email address, or credit card number associated with it, is still "personal identification information" under the Act. *Id*. at 527-28.

22. Plaintiff has submitted sufficient evidence to prove the Act was violated with respect to her own individual claim.

23. Signature debit cards and corporate credit cards are not covered under the Act and thus were excluded from the Class certified in this case.

24. Only an actual ZIP code collected from a customer that was truly the customer's ZIP code is covered under the Act.

25. The Act provides an exception for collection of personal identification information "required for a special purpose incidental but related to the individual credit card transaction, including, but not limited to, information relating to shipping, delivery, servicing, or installation of the purchased merchandise, or for special orders." Cal. Civ. Code § 1747.08(c)(4).

26. The Act does not prevent a retailer from soliciting personal identification information if provision of the information is clearly voluntary on behalf of the customer. However, requesting but not explicitly conditioning the provision of the personal identification information when a customer is paying by credit card is not sufficient to avoid the Act's prohibitions. The customer's perception is key. *Florez v. Linens 'N Things, Inc.*, 108 Cal.App.4th 447, 451 (2003).

27. In *Gass v. Best Buy Co., Inc.*, 279 F.R.D. 561, 571-572 (2012), the district court laid out a cogent continuum of business practices from those most obviously violating the Act because a customer would have to perceive that provision of personal identification information was required to complete the purchase to those most obviously not violating the Act because a customer could not possibly perceive that provision of personal identification information was required to complete the transaction. In this case, for example, if the cashier said, "We're

1  collecting ZIP codes to decide where to locate the next Ikea store.  You don't have to
2  give us your ZIP code, but if you want, I'll enter your ZIP code to let them know
3  you want a store closer to your home," and the customer then provided a ZIP code,
4  this would not be in violation of the Act.

5        28.    Other than her own transactions, Plaintiff has failed to prove that any
6  other violation of the Act occurred.  Plaintiff has also failed to prove that an
7  ascertainable class of some number of similarly situated persons exists who were
8  also subjected to violations of the Act.  Specifically, Plaintiff has failed to show that
9  any individual class member remains after eliminating on Ikea's transaction logs all
10 of the corporate credit cards, signature debit cards, people who provided a ZIP code
11 for home delivery or shipping or some other service or who applied for an Ikea
12 credit card or warranty, people who gave a false ZIP code, and people who were not
13 actually asked their ZIP code but the cashier recorded a false ZIP code.

14       29.    Since there was no evidence of what happened during any other
15 transaction, the Court finds it equally, if not more, likely that the cashier explained
16 what he or she had been told, that the purpose of collecting the ZIP codes was to
17 decide where to put an Ikea store and that provision of a ZIP code was completely
18 voluntary on the part of the customer.  In that situation, the customer's provision of a
19 ZIP code would clearly be voluntary and not in violation of the Act.

20 **IV.   DECERTIFICATION OF CLASS**

21       In light Plaintiff's inability to demonstrate that anyone's rights other than
22 Plaintiff's rights were violated under the Act, the Court could conceivably enter
23 judgment in favor of Ikea on Plaintiff's class claim.  However, given the clear lack
24 of available class-wide proof and common answers and the persistence of individual
25 questions, the Court finds the appropriate action is to decertify the Class prior to
26 entry of final judgment.  Therefore, any individual putative class member who may
27 have a claim against Ikea under the Act may still pursue that claim.
28 ///

### A. Standard for Decertification

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Thus, "before entry of a final judgment on the merits, a district court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative." *Officers For Justice v. Civil Serv. Comm'n of the City & Cnty. of San Francisco*, 688 F.2d 615, 633 (9th Cir. 1982); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978). The Ninth Circuit has recognized that this rule "provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." *Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2011), abrogated on other grounds by *Johnson v. Cal.*, 543 U.S. 499, 504-05 (2005). Thus, "a district court retains the flexibility to address problems with a certified class as they arise, including the ability to decertify. 'Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.'" *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO,CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). Indeed, "[a] district court may decertify a class at any time." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (citing *Falcon*, 457 U.S. at 160).

In evaluating whether to decertify the class, the court applies the same standard used in deciding whether to certify the class in the first place. *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 410 (C.D. Cal. 2000). Thus, a motion to decertify a class is not governed by the standard applied to motions for reconsideration, and does not depend on a showing of new law, new facts, or procedural developments after the original decision. *Ballard v. Equifax Check Serv., Inc.*, 186 F.R.D. 589, 593 n.6 (E.D. Cal. 1999) ("Because the court has the power to alter or amend the previous class certification order under Rule 23(c)(1), the court

need not consider whether 'reconsideration' is also warranted under Fed. R. Civ.P. 60(b) or [local rules governing reconsideration]."); *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 652 (C.D. Cal. 2000) ("Because Defendants' motion assists the Court in performing its role as gatekeeper, or manager, of the class action, the motion should not be denied on the ground that it impermissibly recounts old facts and law….").

Indeed, "[u]nder Rule 23 the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case. The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983). And the court must decertify a class if the requirements for class certification under Rule 23 are not met. *Gonzales v. Arrow Financial Services LLC*, 489 F. Supp. 2d 1140, 1153 (S.D. Cal. 2007); *Slaven*, 190 F.R.D. at 651; *accord Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999).

The United States Supreme Court requires district courts to engage in a "rigorous analysis" to determine whether plaintiffs seeking class certification have met each requirement of Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). In many cases, "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id*. The court's "rigorous analysis" may require it "to probe behind the pleadings before coming to rest on the certification question." *Id*. at 2551 (citation and internal quotations omitted). "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).

### B. Lack of Predominance and Superiority Warrants Decertification

"[A]ny competently crafted class complaint literally raises common

1 'questions'...." *Dukes*, 131 S. Ct. at 2551 (citation omitted). What matters for purposes of determining commonality and predominance is the presence of common answers. *Id*. at 2551-52. Here, Plaintiff has not met this requirement. Plaintiff's evidence at trial has revealed that there is not a common answer to the essential, threshold question of whether requests for ZIP codes were made to each customer, for example.

As outlined above, Plaintiff has failed to prove the existence of a uniform policy of requesting and recording ZIP codes that was uniformly applied or followed. As a result, the predominance of common questions over individual questions has not been shown. The single anecdote of Plaintiff's own transaction does not establish what occurred in other transactions. This failure of proof undercuts the ground upon which certification of the class was initially granted and decertification was denied. And without a common answer to the threshold question of whether ZIP codes were uniformly requested and recorded, none of the other issues is sufficiently important to convince the Court that the most efficient method of determining the rights of the parties is the continuation of this action as a class action. *See Amchem Products Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Furthermore, a class action is only superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1996). Here, it will not and has not. Even at the close of Plaintiff's evidence, individual trials (or mini-trials) are still needed to decide the fundamental question of whether requests for personal identification information were in fact made to each absent class member and the circumstances of any requests, and thus whether a violation of the Act occurred. The absence of common proof to demonstrate these matters is fatal to class treatment.

For these reasons, individual issues predominate and the continued prosecution of this action as a class action is not superior to individual actions.

1  Without predominance of common questions and answers and superiority, this
2  action cannot continue as a class action and the Class is decertified.  Fed. R. Civ. P.
3  23(b)(3) and 23(c)(1)(C).

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Ikea's motion to decertify the Class.  As the Class has been decertified, Ikea's motion pursuant to Rule 52(c) of the Federal Rules of Civil Procedure for judgment on partial findings as to the Class is moot.

However, Ikea's Rule 52(c) motion is **DENIED** as to Plaintiff.  Plaintiff has established liability as to her transactions.  Because the Court has found liability in favor of Plaintiff on her individual claim, the Court declines Ikea's request to enter costs in its favor.  The Court hereby **SETS** the damages phase of the trial on Plaintiff's individual claim for **January 27, 2015** at **9:30 a.m.** in **Courtroom 4B**.

IT IS SO ORDERED.

DATED:  December 4, 2014

Hon. Cynthia Bashant
United States District Judge